IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION <br><br> Plaintiff, <br><br> v. <br><br> FINANCIAL ROBOTICS, INC., a Texas corporation, and MARK E. RICE, <br><br> Defendants. | PLAINTIFF'S BRIEF IN SUPPORT OF ITS *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER, EXPEDITED DISCOVERY, ACCOUNTING, ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF |

## I. INTRODUCTION

Pursuant to Section 6c of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (2006), as amended (the "CEA"), 7 U.S.C. §13a-1 (2006), and based on the egregious fraud and other unlawful acts detailed herein, Plaintiff U.S. Commodity Futures Trading Commission (the "Commission") respectfully submits this Brief in Support of its *Ex Parte* Motion for Statutory Restraining Order, Expedited Discovery, Accounting, Order to Show Cause re: Preliminary Injunction and Other Equitable Relief ("Motion"), and exhibits attached hereto, against Defendants Financial Robotics Inc. ("FinRob") and Mark E. Rice ("Rice") (hereinafter collectively referred to as "Defendants").[1]

---

[1] Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a), provides, in pertinent part: "[N]o restraining order (other than a restraining order which prohibits any person from destroying, altering, or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property and other than an order appointing a temporary receiver to administer such restraining order to perform such other duties as the court may consider appropriate) or injunction for violation of the provisions of this Act shall be issued ex parte by said Court."

1

Commencing in at least September 2006, FinRob, acting through Rice, and Rice fraudulently solicited at least $10.4 million from at least one individual, Robert P. Copeland ("Copeland"), to trade leveraged or margined foreign currency ("forex") transactions on behalf of Copeland. Defendants accepted most of the funds, approximately $9.2 million, directly into bank accounts held in the name of FinRob.

In soliciting Copeland, FinRob, acting through Rice, and Rice falsely claimed that Copeland's investment would be "risk free" and that Defendants' trading was insured against loss. Additionally, Rice guaranteed the return of Copeland's principal investment. Defendants invested some of Copeland's funds in off-exchange forex on a leveraged or margined basis. By February 2009, Defendants notified Copeland that all of his funds had been lost, purportedly in trading, and that Defendants' trading never had been insured against loss. Defendants have not returned the majority of the funds they obtained from Copeland.

Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this motion, as more fully described below, and similar acts and practices. To prevent the further dissipation of investor funds or the potential destruction of Defendants' records, the Commission requests an *ex parte* statutory restraining order ("SRO"): (1) freezing Defendants' assets; (2) appointing a temporary receiver; (3) permitting the Commission and a receiver to inspect and copy Defendants' books, records, documents and correspondence (wherever they may be located); and (4) preventing Defendants from directly or indirectly destroying, mutilating, concealing, altering or disposing of any books, records, documents or correspondence. For the same reasons, the Commission also requests that the Court enter an order granting expedited discovery and requiring Defendants to provide the Commission and the receiver, with a full accounting of their funds, documents and assets. The

Commission further requests that the Court enter an order compelling Defendants to appear before the Court and show cause why a preliminary injunction should not be entered against them to enjoin further violations of the CEA and the Commission Regulations ("Regulation(s)") promulgated thereunder, 17 C.F.R. §1 *et seq.* (2010).

## I. STATEMENT OF FACTS

### A. The Parties

**Plaintiff U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with responsibility for administering and enforcing the provisions of the CEA and the Regulations promulgated thereunder.

**Defendant Financial Robotics, Inc.** is a Texas corporation with its principal places of business at: 4008 Louetta Road, #414, Spring, Texas; 2700 Post Oak Boulevard, Suite 2375, Houston, Texas; and 3881 Southwest Freeway, Suite 503, Houston, Texas. Exhibit 1, Declaration of Michelle S. Bougas ("Bougas") ¶ 22. FinRob is engaged in the business of providing advice for profit on the trading of forex and soliciting and accepting funds to trade forex on behalf of others. Exhibit 2, Declaration of Robert P. Copeland ("Copeland") ¶¶ 3-17. FinRob has never been registered with the Commission in any capacity. Bougas ¶ 25.

**Defendant Mark E. Rice** currently resides in Sugar Land, Texas. Bougas ¶ 23. He is engaged in the business of providing advice for profit on the trading of forex and soliciting and accepting funds to trade forex on behalf of others. Copeland ¶¶ 3-17. Rice is the apparent owner and manager of FinRob. Copeland ¶¶ 3-17. Rice has never been registered with the Commission in any capacity. Bougas ¶ 27.

### B. FinRob And Rice's Fraudulent Solicitations

3

Commencing in September 2006, Defendants, acting directly or through their agents, employees or officers, solicited at least $10.4 million from at least one investor, Copeland, to invest in forex, with most of the funds, approximately $9.2 million, being accepted directly by Defendants into accounts held by FinRob.[2] Bougas ¶¶ 36-63; Copeland ¶¶ 3-17.

### 1. FinRob And Rice Claimed That Investment Would Be "Risk Free"

In his solicitations of Copeland, Rice told him that Defendants developed automated forex software trading programs known as expert advisors ("EA") that generated "phenomenal returns" (30% per month) in test situations in American and European markets and significant profits (10-15% per month) in actual trading. Copeland ¶¶ 3-5. Rice told Copeland that his investment would be "risk free," as he would only invest a small percentage of the funds at any time. Copeland ¶ 4. Additionally, Rice guaranteed that if Copeland invested with Defendants, he would not lose any of his principal investment because Defendants had an insurance policy that protected against any loss of principal. Copeland ¶ 4. In reliance on Rice's statements regarding Defendants' profitable trading history and Rice's claims that Copeland's investment would be "risk free" and insured against loss, Copeland decided to invest with Defendants.[3] Copeland ¶ 6.

### 2. FinRob And Rice Directed The Trading Of Copeland's Funds

---

[2] Defendants fraudulently solicited approximately $1.4 million of those funds from Copeland after the Commission's jurisdiction over forex transactions was clarified and expanded by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (CFTC Reauthorization Act of 2008 (the "CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008). Defendants traded at least some of Copeland's funds in forex after June 18, 2008. Bougas ¶ 36-61.

[3] Copeland obtained the funds that he invested with Defendants through his fraudulent solicitation of at least $45 million from at least 125 individuals in a separate and distinct Ponzi scheme concerning investment in real estate financing and/or development. Copeland confessed to his involvement in the Ponzi scheme and is currently serving a 121 month sentence at the Federal Prison Camp, Maxwell Air Force Base, Montgomery, Alabama. *United States v. Copeland*, No. 1:09-cr-0178 (N.D. Ga. Sept. 22, 2009). Bougas ¶¶ 29-33.

Rice initially instructed Copeland to open a trading account with a futures commission merchant ("FCM") and deposit funds for investment into that account. Copeland ¶ 7. In January 2007, Copeland deposited approximately $502,000 into the account. Copeland ¶ 7. Rice managed the forex trading in the account and provided performance reports to Copeland via e-mail. Copeland ¶ 8. Rice's trading of the funds in the account resulted in significant losses. Bougas ¶ 43; Copeland ¶ 8.

Thereafter, Rice told Copeland that he could avoid such losses in the future if he withdrew his funds from the FCM and deposited them directly with Rice. Copeland ¶ 9. Rice informed Copeland that he was going to move all of his investments to England, as that market could provide greater returns than the American market. Copeland ¶ 9. In reliance on Rice's promises of improved performance, Copeland withdrew his funds from the FCM and invested them directly with Rice. Copeland ¶ 9.

Rice directed Copeland to deposit his funds for investment into bank accounts held by FinRob and another entity controlled and managed by Rice, Commodity Futures and Options Service, Inc. ("CFOS"). Copeland ¶ 10. Between March 2007 and August 2008, Copeland wired approximately $9.9 million to CFOS and FinRob bank accounts. Bougas ¶ 36; Copeland ¶ 10. Copeland wired approximately $1.4 million of those funds to FinRob after June 18, 2008. Bougas ¶ 36.

Rice told Copeland that his funds would be invested in forex trading. Copeland ¶ 10. Between May 2007 and September 2008, FinRob, acting through Rice, and Rice invested approximately $4.8 million of Copeland's funds into forex trading accounts held in the name of

5

CFOS and FinRob.[4] Bougas ¶¶ 45-61. However, only a portion of the funds were traded with net losses of approximately $1.8 million. Bougas ¶¶ 45-61.

### 3. FinRob And Rice Claimed No Losses From Trading

On a weekly basis, Rice engaged in telephone conversations with Copeland regarding the performance of Copeland's investment. Copeland ¶ 12. Specifically, Rice informed Copeland that his funds consistently generated returns between 5-9% per month and experienced no losses. Copeland ¶ 12. Copeland maintained his funds with Defendants based on the positive returns Rice reported to Copeland and Rice's continued assurances that Copeland's investment was "risk free." Copeland ¶ 6. From July 2007 to September 2008, Defendants wired approximately $1.7 million to Copeland as purported earnings. Bougas ¶¶ 37-38; Copeland ¶ 11.

### 4. FinRob And Rice Projected Continued Profits

Copeland relied on Rice's projections of continued profits. For example, in September 2008, Rice talked Copeland out of liquidating his trading account with Defendants based on Rice's claims of historic and future profitability. Copeland ¶ 13. At this time, Rice indicated that the balance of Copeland's investment was approximately $15 million and that if Copeland maintained his trading account with Rice through January 2009, his investment would grow to $20 million. Copeland ¶ 13. Based on Rice's claims, Copeland agreed to leave his money with Rice for the foreseeable future. Copeland ¶ 13.

### 5. Copeland's Funds "Lost" And Not Returned

Two months later, in November 2008, Rice notified Copeland that his funds had been purportedly lost in trading. Copeland ¶ 15. Copeland demanded the return of his principal investment, as Rice had guaranteed, but since December 2008, Defendants have only returned

---

[4] Approximately $408,000 was deposited into FinRob trading accounts after June 18, 2008. Bougas ¶ 56.

6

approximately $773,000 of Copeland's $10.4 million investment, for a total return of funds of approximately $2.7 million. Bougas ¶¶ 37-38; Copeland ¶¶ 11, 16 and 17. In February 2009, Rice notified Copeland that Defendants' trading had never been insured against loss. Copeland ¶ 16. Despite Rice's promise to return Copeland's principal, Defendants have not returned the majority of his funds or otherwise fully accounted for their handling or use of the funds obtained from Copeland. Copeland ¶ 17.

### C. Defendants Refuse To Cooperate With Commission Investigation

Defendants refused to provide information to the Commission concerning their management of investor funds. On December 10, 2009, the Commission subpoenaed testimony and documents from Rice, individually and as an officer, owner and/or manager of certain companies, including but not limited to CFOS and FinRob, pertaining to their management of investor funds. Bougas ¶ 14. On January 28, 2010, Rice responded to the Commission's subpoena by refusing to provide any information and/or testimony requested by the subpoena. Bougas ¶ 15. As a direct result, the Commission has been unable to determine the full extent of Defendants' fraudulent conduct. Bougas ¶ 15.

### D. Rice Was FinRob's Agent

Rice is the apparent owner and manager of FinRob. Rice acted on behalf of FinRob by, among other things, soliciting funds from Copeland and directing that Copeland send those funds to FinRob's bank accounts. Copeland ¶¶ 3-13.

## II. ARGUMENT

The Court should issue the *Ex Parte* Statutory Restraining Order and Preliminary Injunction because Defendants fraudulently solicited Copeland in violation of the CEA and Regulations. Due to the nature of this fraud, the Commission seeks an order that, among other

things, freezes assets under the control of the Defendants, prohibits the removal or destruction of documents and evidence, appoints a receiver, requires an accounting and allows for expedited discovery. Plaintiff also seeks a preliminary injunction prohibiting, among other things, any future violations of the CEA and Regulations because the evidence gathered thus far establishes a reasonable likelihood that Defendants' violations of the CEA and Regulations will continue unless enjoined.

### A. Defendants Violated Section 4b(a)(2)(A) And (C) Of The CEA, As Amended By The CRA

Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; ... [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

Through their misrepresentations and omissions of material fact, FinRob, acting through Rice, and Rice violated Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA.

To establish that Defendants violated Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, the Commission must prove that: (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was material. *CFTC v. King*, No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (*citing CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). As shown below, FinRob, acting through Rice, and Rice, through their intentional and reckless misrepresentations and omissions of material fact

8

regarding profits, guarantees and risk in their solicitations of Copeland, violated Section 4b(a)(2)(A) and (C) of the CEA, as amended.

### 1. Defendants Made Misrepresentations And Omissions

When determining whether a misrepresentation has been made, one must look to the "overall message" and the "common understanding of the information conveyed." *R.J. Fitzgerald*, 310 F.2d at 1328 (citing *Hammond v. Smith Barney Harris Upham & Co., Inc.* [1987-1990 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 and n.12 (CFTC Mar. 1, 1990)). The allegedly false or misleading representations should be viewed through the eyes of an objectively reasonable person interpreting their overall message. *R.J. Fitzgerald*, 310 F.3d at 1329. Further, misrepresentations concerning the likelihood of profiting from forex trading and risk of loss are generally deemed to be material and violative of the antifraud provisions of the CEA. *See, e.g. CFTC v. Avco Financial Corp.*, 28 F. Supp. 2d 104, 115-16 (S.D.N.Y. 1998), *aff'd in part, rev'd in part, remanded in part on other grounds sub nom. CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000); *First Nat. Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987). "Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002); *CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1160 (S.D.N.Y. 1979) (misrepresentations regarding profitability of investment are material).

Here, FinRob, acting through Rice, and Rice made misrepresentations and omissions in their solicitations of Copeland to participate in forex trading. In their solicitations, Rice guaranteed that Copeland's investment would be "risk free" and misrepresented that he

9

maintained an insurance policy that would protect Copeland's principal investment from loss. However, Defendants' trading resulted in significant losses. Moreover, Defendants never held an insurance policy protecting Copeland's principal from loss.

### 2. Defendants Acted With Scienter

FinRob, acting through Rice, and Rice acted with the requisite scienter in making these misrepresentations and omissions. The scienter element is established when an individual's "conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant 'must have been aware' of the risk." *CFTC v. King*, No. 3:06-CF-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (citing *R.J. Fitzgerald*, 310 F.3d at 1328) (internal quotations omitted)); *Wasnick v. Refco, Inc.*, 911 F.2d. 345, 348 (9th Cir. 1990) (citation omitted) (holding that scienter is established when an individual's acts are performed "with knowledge of their nature and character").

In order to meet the scienter requirement, the Commission must demonstrate that Defendants made the misrepresentations and omissions intentionally or recklessly. *Drexel Burnham Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988) (recklessness is sufficient to satisfy scienter requirement); see also *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 774 (9th Cir. 1995) (discussing Section 4b's scienter requirement). To prove that the conduct is intentional, the Commission must demonstrate that the actions of Defendants were "intentional as opposed to accidental." *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985). To prove that conduct is reckless, the Commission must show that it "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing."

*Drexel Burnham Lambert*, 850 F.2d at 748 (alteration in original) (internal quotation marks and citation omitted).

The Commission need not prove that Defendants possessed an evil motive or intent to injure a customer, or that they subjectively wanted to cheat or defraud their customers. *See Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987); *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985) ("Proof of an evil motive is unnecessary."). "It is enough that [they] acted deliberately." *See Haltmier v. CFTC*, 554 F.2d 556, 562 (2d Cir. 1977). Moreover, "the element of knowledge cannot be precluded by ignorance brought about by willfully or carelessly ignoring the truth." *CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir. 1979).

Rice controlled Copeland's funds and the information provided to him, including but not limited to information regarding guaranteed return of principal and claim of an insurance policy. Accordingly FinRob, acting through Rice, and Rice knew, or recklessly disregarded, that their statements regarding limited risk and guarantees of return of principal were false. Defendants' actions were intentional and reckless, and involved "highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care," *Noble Wealth,* 90 F. Supp. 2d at 686 (quoting *Messer*, 847 F.2d at 678), and as such, they were made with scienter.

### 3. Defendants' Misrepresentations And Omissions Were Material

Defendants' misrepresentations and omissions to Copeland were material. A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Technical Serv. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000); *see also R.J. Fitzgerald*, 310 F.3d at 1328-1329. Any fact that enables customers to assess independently the risk inherent in their investment and the

likelihood of profit is a material fact. *In re Commodities Int'l Corp.*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 at 44,563-564 (CFTC Jan. 14, 1997) (misrepresentations and omissions to customers were material and fraudulent because customers could not properly evaluate their circumstances with regard to risk of loss and opportunity for profit).

Similarly, it is well established that misrepresentations regarding profit and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law." *Noble Wealth*, 90 F. Supp. 2d at 686 (citing *Commonwealth Fin. Group*, 874 F. Supp at 1353 (guarantees of profitability are prohibited by Section 4b); *Hall v. Paine Webber Jackson & Curtis, Inc.*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,317 at 32,890 (CFTC Oct. 8, 1986) (when broker emphasized limited risk and explained rationale for expected profits, it was reasonable for customer to interpret a prediction of a specific and substantial level of profits as a guarantee of some profit); *Keller v. First Nat'l Monetary Corp.*, [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,402 at 29,823 (CFTC Oct. 22, 1984)). "When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers." *Id.* (quoting *In re JCC Corp.*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,576 n. 23 (CFTC May 12, 1994), *aff'd sub nom, JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995)).

Defendants' misstatements and omissions regarding insurance against loss and guaranteed return of principal were material because a reasonable investor would have relied on these statements in determining whether to invest in forex and, more specifically, whether to invest with Defendants.

### B. FinRob Is Liable For Rice's Violations

Section 2(a)(1)(B) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2, provide that the "act, omission, or failure of any official, agent, or other person acting for ... [a] corporation ... within the scope of his employment or office shall be deemed the act, omission, or failure of such... corporation ..., as well as of such official, agent, or other person." *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez and Wellington Advisory, Inc. v. CFTC*, 837 F.2d 847, 857-58 (9th Cir. 1988).

In the present case, the agent-principal relationship is clear and direct. Rice is the apparent owner and manager of FinRob. Rice acted on behalf of FinRob by, among other things, soliciting funds from Copeland and directing that Copeland send those funds to FinRob's bank accounts. Accordingly, FinRob is liable for Rice's violations of the CEA pursuant to Section 2(a)(1)(B) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

### III. STANDARDS FOR RELIEF

#### A. An *Ex Parte* Statutory Restraining Order Is In The Public Interest And May Be Granted Pursuant To Section 6(c) Of The CEA

The Court should issue an *Ex Parte* Statutory Restraining Order because it is in the public interest to prevent disposal of funds, destruction of records and continued violations of the CEA.

Section 6c(a) of the CEA *explicitly* authorizes the Court to issue an *ex parte* restraining order freezing assets, appointing a temporary receiver and prohibiting any person from destroying Defendants' records or denying Commission officials access to Defendants' records.[5]

---

[5] District courts have applied Section 6c in the Commission's enforcement cases to issue *ex parte* SROs. *See, e.g., CFTC v. Groover*, 2011 WL 1490901, at *1 (E.D. Tex. Feb. 11, 2011); *CFTC v. Yancy*, No. 4:10-cv-02955 (S.D. Tex. filed Aug. 18, 2010); *CFTC v. PrivateFX Global One Ltd.*, No. 4:09-cv-01540

*See* 7 U.S.C. § 13a-1. Congress authorized district courts to issue restraining orders in Commission enforcement cases in order to "to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers." H.R. Rep. No. 97-565, Part I, 97th Cong., 2d Sess. 53-54, 93 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3902-03, 3942. The Court has "broad discretion" to grant such statutory relief, including an asset freeze, when presented with a "prima facie case of illegality." *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 583 (9th Cir. 1982) (the Court may also grant relief ancillary to injunctive relief); *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981).[6]

An asset freeze is especially appropriate here to preserve funds for disgorgement and restitution to Copeland's wronged investors. *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979); *CFTC v. Trending Cycles for Commodities, Inc.*, (1980-1982 Transfer Binder) Comm. Fut. L. Rep. (CCH) ¶ 21,013 at 23,970 (S.D. Fla. 1980). Moreover, a freeze maintains the court's jurisdiction over the assets when disgorgement or restitution is ordered. *CFTC v. American Metal Exch. Corp.*, 693 F. Supp. 168, 196 (D.N.J. 1988).

An order prohibiting the destruction of records and granting the Commission access to inspect and copy records will allow the Commission to identify assets and victims. *See Co Petro*, 680 F.2d at 583; *Clothier*, 799 F. Supp. at 493. Such relief will "preserve the status quo while an investigation is conducted to clarify the sources of various funds." *Morgan*, 484 F. Supp. at 678.

---

(S.D. Tex. filed May 21, 2009); *CFTC v. Rusfeldt*, No. 3:07-cv-00130 (S.D. Tex. filed Mar. 12, 2007); *CFTC v. Schafer*, No. 4:96-cv-01213 (S.D. Tex. filed Apr. 17, 1996).

[6] Because Plaintiff's injunctive actions derive from statute, Federal Rule of Civil Procedure 65 does not govern a request for a restraining order under Section 6c(a). *CFTC v. Clothier*, 799 F.Supp. 490, 492-93 (D. Kan. 1992).

The appointment of a receiver is appropriate where, as in this case, it is necessary to protect the public interest. *Morgan*, 484 F. Supp. at 677; *CFTC v. M25 Invs., Inc.*, 2009 WL 3740627, at **4-6 (N.D. Tex. Sept. 29, 2009)(the Court granted the CFTC's motion to appoint a receiver to marshal and preserve assets); *Cf. SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972) (courts repeatedly have upheld the appointment of receivers to effectuate the purposes of the federal securities laws). A receiver investigates the Defendants' activities, ascertains the Defendants' financial status and the identity of investors and prevents diversion or waste of the Defendants' assets to the detriment of customers. *Morgan*, 484 F. Supp. at 677; *CFTC v. Chilcott Portfolio Mgmt.,Inc.*, 713 F.2d 1477 (10th Cir. 1983); *American Metal Exch. Corp.*, 693 F. Supp. 168, 196 (D.N.J. 1988).

In this matter, the appointment of a receiver is necessary to ensure that all assets are identified and located, all clients are identified and the scope and full nature of Defendants' wrongdoing is ascertained. A receiver is necessary to protect the public interest by marshalling, monitoring and protecting any remaining assets in the possession and control of the Defendants.

In light of the evidence supporting the fraud allegations, Copeland's unanswered demands for his money and Defendants' refusal to cooperate with the Commission's investigation, an order that, among other things, freezes assets, prohibits the destruction of documents, grants the Commission access to documents and appoints a receiver, is appropriate here.

### B. Expedited Discovery and an Accounting Are Appropriate to Enable the Commission to Fulfill Its Statutory Duties

The Commission also moves this Court for an order granting expedited discovery and requiring an accounting for the purpose of ascertaining Defendants' assets and the identity of Defendants' customers. Expedited discovery, in advance of that provided by Fed. R. Civ. P. 26

is necessary to enable the Commission to fulfill its statutory duties. Specifically, discovery of Defendants' complete assets and customers will enable the Commission to protect Defendants' and Copelands' customers from further loss and damage by ensuring that the Defendants are complying fully with the Court's restraining order.

An immediate accounting and expedited discovery is necessary and appropriate to locate and secure Defendants' and investor funds, and further investigate the expanse of Defendants' fraud. *See, e.g., Groover,* 2011 WL 1490901, at **2-3, 5 (court ordered an accounting and expedited discovery where good cause to believe defendant may have violated the CEA); *M25 Invs.,* 2009 WL 3740627, at **2-3, 6 (expedited discovery ordered where good cause to believe defendant may have violated the CEA).

### C. Order to Show Cause Why Preliminary Injunction Should Not Be Issued Is Necessary

Plaintiff also seeks an order to show cause as to why a preliminary injunction should not be issued prohibiting, among other things, any future violations of the CEA or Regulations. In that regard, Section 6c of the CEA provides federal courts with broad discretion to fashion appropriate relief, afford redress to aggrieved parties, and deter violations of the CEA. *Co Petro,* 680 F.2d at 583 (Section 6c of the CEA provides the court with authority to issue a broad variety of orders). In fact, Section 6c(a) provides that "(u)pon a proper showing, a . . . temporary injunction . . . shall be granted without bond."

Unlike private actions, which are rooted in the equity jurisdiction of the federal court, Commission suits for injunctive relief are statutorily created. The injunctive relief contemplated in Section 6c of the CEA is remedial in nature, and is designed to prevent injury to the public and to deter future illegal conduct. "When the 'public interest is involved . . . the district court's equitable powers assume an even broader and more flexible character than when only a private

16

controversy is at stake.'" *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989); *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987).

Therefore, restrictive concepts ordinarily associated with private litigation, such as proof of irreparable injury or inadequacy of other remedies, are inapplicable. *See Odessa*, 833 F.2d at 176; *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978) (holding that there is no requirement for a showing of irreparable harm where an injunction is authorized by a federal statute); *Co Petro*, 502 F. Supp. at 818. Indeed, upon a showing that the CEA has been violated, irreparable injury may be presumed. *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) *cert. denied sub nom., Windrush Partners, Ltd. v. Metro Fair Housing Svcs.*, 469 U.S. 882 (1984) (finding presumption of irreparable injury in statutory enforcement action). As irreparable harm is presumed, the Court need only find some chance of probable success on the merits. *See FTC v. World Wide Factors*, 882 F.2d 344, 247 (9th Cir. 1989); *Gresham*, 730 F.2d at 1423. And, that will be satisfied by a prima facie showing of illegality. *See Muller*, 570 F.2d at 1300.

Accordingly, the CFTC is entitled to injunctive relief upon a showing that a violation has occurred and is likely to continue unless enjoined. *Odessa*, 833 F.2d at 174; *Sahni*, 868 F.2d at 1097; *Co Petro*, 680 F.2d at 583 n.16 (court correctly issued permanent injunction where there was a reasonable likelihood of future violations); *FTC v. Sage Seminars, Inc.*, 1995 WL 798938, at *8 (N.D. Cal. Nov. 2, 1995); *see also Kemp v. Peterson*, 940 F.2d 110, 113 (4th Cir. 1991). "'(T)he commission of past illegal conduct is highly suggestive of the likelihood of future violations.'" *CFTC v. Crown Colony Comm. Options, Ltd.*, 434 F. Supp. 911, 919 (S.D.N.Y. 1977) (*quoting SEC v. Mgmt. Dynamics*, 515 F.2d 801, 807 (2d Cir. 1975). Even a purported cessation of illegal activity should not prevent the granting of a preliminary injunction. *Crown Colony*, 434 F. Supp.

17

at 919-20 ("past actions speak louder than . . . present words.").

Injunctive relief is appropriate in this case because Defendants repeatedly and with *scienter* engaged in core violations of the CEA and Regulations for over four years. The ancillary relief sought in this case is of the type typically sought in an injunctive action and is well within the court's equitable jurisdiction. Therefore, the Commission requests that the Court enter an order compelling Defendants to appear before the Court and show cause why a preliminary injunction should not be entered against them to enjoin further violations of the CEA and Regulations.

## IV. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the Commission's Motion and issue a SRO: (1) freezing Defendants' assets; (2) appointing a temporary receiver; (3) permitting the Commission and the receiver to inspect and copy Defendants' books, records, documents and correspondence (wherever they may be located); and (4) preventing Defendants from directly or indirectly destroying, mutilating, concealing, altering or disposing of any books, records, documents or correspondence. The Commission also requests that the Court enter an order granting expedited discovery and requiring Defendants to provide the Commission and the receiver, with a full accounting of their funds, documents and assets. The Commission further requests that the Court enter an order compelling Defendants to appear before the Court and show cause why a preliminary injunction should not be entered against them to enjoin further violations of the CEA and Regulations.

Dated: 6/27/11                    Respectfully submitted,

ATTORNEYS FOR THE PLAINTIFF
U.S. COMMODITY FUTURES TRADING
COMMISSION

_____
Kevin S. Webb, DC Bar #484866
Attorney-in-Charge
James H. Holl, III, CA Bar #177885
Gretchen L. Lowe, DC Bar # 421995
U.S. Commodity Futures Trading Commission
1155 21st Street NW
Washington, DC 20581
Telephone: (202) 418-5000
Facsimile: (202) 418-5538

## CONSENT TO RELEASE OF FINANCIAL RECORDS

I, Mark E. Rice, of Sugar Land, Texas, do hereby direct any bank or trust company at which I have a bank account or other financial account of any kind or at which I have a bank account or other financial account of any kind which I have operated under the name of Financial Robotics, Inc., or any other name, or a corporation or other entity has an account of any kind upon which I am authorized to draw, and its officers, employees and agents, to disclose all information and deliver copies of all documents of every nature in your possession or control which relate to said bank or other financial accounts to any attorney of the United States Commodity Futures Trading Commission, and to give evidence relevant thereto, and this shall be irrevocable authority for so doing. This direction is intended to apply to the laws of countries other than the United States which restrict or prohibit the disclosure of bank information without the consent of the holder of the account, and shall be construed as consent with respect thereto, and the same shall apply to any of the bank accounts for which I may be a relevant principal.

Dated:_____                    _____
                                   Mark E. Rice