IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FINANCIAL ROBOTICS, INC., a Texas corporation, and MARK E. RICE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) Case No. 4:11-cv-02446<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED COMPLAINT FOR PERMANENT INJUNCTION, DISGORGEMENT, RESTITUTION, CIVIL MONETARY PENALTIES AND OTHER EQUITABLE RELIEF**

Plaintiff U.S. Commodity Futures Trading Commission ("Commission") alleges as follows:

### I.  SUMMARY

1.  Commencing in at least September 2006, Defendants Financial Robotics Inc. ("FinRob") and Mark E. Rice ("Rice")(hereinafter collectively referred to as "Defendants"), acting directly or through their agents, employees or officers, fraudulently solicited approximately $10.4 million from at least one individual, Robert P. Copeland ("Copeland"), for the purported purpose of trading managed accounts and/or a pooled investment operated and managed by Rice in connection with agreements, contracts or transactions in off-exchange foreign currency ("forex") that are margined or leveraged.

2. In soliciting Copeland, FinRob, acting through at least Rice, and Rice falsely claimed that Copeland's investment would be "risk free" and that Defendants' trading was insured against loss. Rice also guaranteed the return of Copeland's principal investment.

3. The funds invested by Copeland were funds that he fraudulently obtained from individuals in connection with a separate fraud that Copeland was perpetuating and for which he pled guilty to federal wire fraud charges.

4. Defendants, through the acts and omissions of at least Rice, funneled at least $2.4 million of Copeland's funds to various corporate entities Rice controlled, including but not limited to Bison Holdings, Inc. ("Bison Holdings"), Commodity Futures and Options Services, Inc. ("CFOS"), Corporate Services, Inc. ("Corporate Services"), Deposit Capital, Inc. ("Deposit Capital"), InventBay Holdings, Inc. ("InventBay"), Lanxide Corporation ("Lanxide"), Nemaha, Inc. ("Nemaha"), Texana, Inc. ("Texana") and U232, Inc. ("U232")(collectively, the "Rice Companies"), that did not provide any legitimate services, nor have any legitimate interest or entitlement to Copeland's funds.

5. Rice used at least $1.3 million of the funds sent to the Rice Companies to pay for, among other things, luxury vacations, motorcycles and racehorses. Rice made significant cash withdrawals of Copeland's funds and used Copeland's funds to make payments on numerous credit cards held by Rice and other individuals and entities.

6. Defendants, through at least Rice, did not disclose to Copeland that they would transfer his funds to third parties under Rice's control and use those funds to pay Defendants' business expenses and Rice's personal expenses.

7. In September 2008, Copeland confided to Rice that the funds that Copeland had invested with Defendants were misappropriated from Copeland's investors.

8. In November 2008, FinRob, acting through Rice, and Rice notified Copeland that all of his funds had been lost in trading.

9. In February 2009, FinRob, acting through Rice, and Rice informed Copeland that Defendants' trading had never been insured against loss.

10. Defendants have not returned the majority of the Copeland funds.

11. By virtue of this conduct and the further conduct described herein, Defendants have engaged, are engaging in, or are about to engage in practices in violation of the anti-fraud provisions of Section 4b(a)(2)(A) and (C) of the Commodity Exchange Act ("CEA"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008).

12. Accordingly, pursuant to Sections 6c and 2(c)(2) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. §§ 13a-1 and 2(c)(2), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel Defendants to comply with the CEA. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, rescission, restitution, disgorgement, pre- and post-judgment interest and such other relief as the Court may deem necessary and appropriate.

13. Unless enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Amended Complaint and similar acts and practices, as more fully described below.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to Section 6c of the CEA, as amended, to be codified at 7 U.S.C. § 13a-1, and Section 2(c)(2) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C).

15. Section 6c(a) of the CEA, as amended by CRA, to be codified at 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief in district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the CEA or any rule, regulation, or order thereunder. In addition, this section authorizes the Commission to bring a civil action in district court to enforce compliance with the CEA and any rule, regulation or order thereunder.

16. Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, as amended by CRA, to be codified at 7 U.S.C. § 13a-1(e), because Defendants are found, inhabit, reside and/or transact business in the Southern District of Texas, and certain of the transactions, acts, practices, and courses of business alleged to have violated the CEA occurred, are occurring, and/or are about to occur within this District.

## III. THE PARTIES

17. Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA, as amended, to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010). The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

18. Defendant **Financial Robotics, Inc.** is a Texas corporation with its principal place of business at 2700 Post Oak Boulevard, Suite 2375, Houston, Texas 77056. FinRob is

engaged in the business of providing advice for profit on the trading of forex and soliciting and accepting funds to trade forex on behalf of others. FinRob has never been registered with the Commission in any capacity. FinRob is not a financial institution, registered broker dealer, insurance company, financial holding company or investment banking holding company, and is not an associated person of such entities. The forex transactions offered or conducted by Defendants neither resulted in delivery nor created an enforceable obligation to deliver between a seller and a buyer, that have the ability to deliver and accept delivery, respectively, in connection with their lines of business. The known customer of FinRob, Copeland, is not an eligible contract participant. *See* Section 1a of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 1a (defining an "eligible contract participant," in relevant part, as an individual with total assets in excess of (i) $10 million, or (ii) $5 million and who enters the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual"). Rice founded and controlled FinRob, solicited funds to trade forex on behalf of FinRob, and managed client funds held by FinRob and FinRob's trading of those funds in forex.

19. Defendant **Mark E. Rice** resides in Sugar Land, Texas. He is engaged in the business of providing advice for profit on the trading of forex and soliciting and accepting funds to trade forex. Rice controlled and is the apparent owner and manager of FinRob and the Rice Companies. Rice has never been registered with the Commission in any capacity. Rice is not a financial institution, registered broker dealer, insurance company, financial holding company or investment banking holding company and is not an associated person of such entities. Rice controls Bison Holdings and is its sole shareholder, president, chief financial officer ("CFO") and primary employee. Rice was on the board of directors of CFOS, solicited funds to trade

forex on behalf of CFOS and managed client funds held by CFOS and CFOS' trading of those funds in forex. Rice controls CFOS, is a direct and indirect (via Brazos Partners Inc. ("Brazos Partners")) shareholder of CFOS and was its director. Rice controls Brazos Partners and is its majority shareholder, sole member of its board of directors and sole officer/executive/employee. Rice founded and controls Corporate Services, funds Corporate Services' operations, directs the flow of funds in Corporate Services' accounts and is its director. Rice controls Deposit Capital and is its sole shareholder, sole member of its board of directors, chief executive officer ("CEO") and CFO. Rice controls InventBay. Rice controls Lanxide and is its sole shareholder, CEO and sole employee. Rice controls Nemaha and is its director and primary employee. Rice owns, operates and controls Texana and is its officer and sole employee. Rice controls U232.

## IV.   FACTS

**A.   DEFENDANTS' FRAUDULENT SOLICITATION**

20.  Commencing in September 2006, Defendants, acting directly or through their agents, employees or officers, solicited approximately $10.4 million from at least one individual, Copeland, for the purported purpose of trading managed accounts and/or a pooled investment operated and managed by Rice in connection with agreements, contracts or transactions in off-exchange forex that are margined or leveraged.

21.  Rice held himself out as the owner and manager of FinRob at all relevant times including, but not limited to, when he solicited funds from Copeland.

22.  Defendants solicited Copeland directly or through their agents, employees or officers, through face-to-face meetings, facsimile correspondence and telephone communications. Defendants used the instrumentalities of interstate commerce in their solicitations of Copeland.

23. In Rice's solicitations of Copeland, Rice told him that Defendants had developed automated forex software trading programs known as expert advisors ("EAs") that generated "phenomenal returns" (30% per month) in test situations in American and European markets and significant profits (10-15% per month) in actual trading.

24. Rice told Copeland that his investment with Defendants would be "risk free," as Rice would only invest a small percentage of Copeland's funds at a time. Rice also guaranteed that Copeland would not lose his principal investment, as he represented that Defendants maintained an insurance policy that would protect Copeland's principal from loss.

25. Defendants, through the acts of and omissions of at least Rice, did not disclose to Copeland that they would transfer his funds to Rice controlled entities, including but not limited to the Rice Companies.

26. Defendants, through the acts and omissions of at least Rice, did not disclose to Copeland that they would use his funds to pay Defendants' business expenses and Rice's personal expenses.

27. In reliance on Rice's claims regarding Defendants' profitable trading history, and Rice's claims that Copeland's investment would be "risk free" and insured against loss, Copeland decided to invest with Defendants.

28. Copeland did not invest his own assets with Defendants. Copeland invested funds with Defendants that he had fraudulently solicited from at least 125 individuals for investment in real estate financing and/or development activities. On April 20, 2009, Copeland pled guilty to one count of wire fraud stemming from his fraudulent solicitations of real estate investors. Copeland is serving a 121 month sentence at the Federal Correctional Institution Williamsburg, Salters, South Carolina. *See United States v. Copeland*, No. 1:09-CR-00178-BBM (N.D. Ga.

Sept. 22, 2009). Copeland was also subject to an enforcement action by the Securities and Exchange Commission. *See SEC v. Copeland*, No. 1:09-cv-00943 (N.D. Ga. April 9, 2009).

29. Rice initially instructed Copeland to open a trading account in Copeland's name with a registered futures commission merchant ("FCM") and deposit funds for investment into that account. In January 2007, Copeland opened an individual trading account at an FCM and wired approximately $502,000 into the account. Rice managed the forex trading in the account and provided performance reports to Copeland via e-mail. Rice's trading of the funds in off-exchange forex on a leveraged or margined basis resulted in overall losses of approximately $101,000.

30. Rice told Copeland that he could avoid this type of loss in the future if Copeland withdrew his funds from the FCM and deposited them directly with Rice. Rice informed Copeland that he was going to move all of his investments to England, as that market could provide greater returns than the American market. In reliance on Rice's promises of improved performance, Copeland withdrew his funds from the FCM and invested them directly with Rice.

31. Rice directed Copeland to deposit his funds for investment into bank accounts held by FinRob, and another entity controlled and managed by Rice, CFOS.

32. Between March 2007 and August 2008, Copeland complied with Rice's direction and wired approximately $9.9 million to CFOS and FinRob bank accounts for investment in forex managed by Defendants. Most of the Copeland funds went into FinRob bank accounts.

33. As of June 18, 2008, Defendants maintained at least $303,000 of Copeland's funds in bank and trading accounts that they controlled. Copeland wired approximately $1.4 million to FinRob after June 18, 2008, bringing Copeland's post June 18, 2008 total deposits with Defendants to at least $1.7 million.

34. Between May 2007 and September 2008, FinRob, acting through Rice, and Rice deposited approximately $5.75 million of the Copeland funds into leveraged forex trading accounts held in the name of CFOS, FinRob and Wertpatiere Kreditanstalt AG Trust at various FCMs and brokerage houses. Defendants, through Rice, deposited approximately $408,000 of the Copeland funds into FinRob forex trading accounts after June 18, 2008.

35. In those trading accounts, between October 2007 and January 2009, Defendants traded some of the Copeland funds and sustained net losses of approximately $7.9 million – losing approximately $2.15 million more of Copeland's funds than they had deposited due to a purported trading error. Defendants sustained trading losses of approximately $382,509 after June 18, 2008.

36. Between July 2007 and September 2008, Defendants wired approximately $1.7 million to Copeland as purported earnings from their forex trading. Defendants wired approximately $100,000 of those purported earnings to Copeland after June 18, 2008.

37. Copeland maintained his investors' funds with Defendants and invested additional funds of his investors with Defendants based on the false returns Rice reported to Copeland, Rice's projections of continued profits and Rice's continued minimization of the risks associated with Copeland's investment.

38. Rice contacted Copeland by telephone on a weekly basis to report on the performance of Copeland's investment. In those phone conversations, Rice falsely informed Copeland that his funds consistently generated returns between 5-9% per month and experienced no losses.

39. As of September 2008, Copeland believed his investment with Defendants was worth $15 million and would further increase in value. In September 2008, at a meeting in

Houston, Texas, Rice talked Copeland out of liquidating his account based on Rice's claims of historic and future profitability. Rice showed Copeland a spreadsheet reporting that Defendants' forex trading on behalf of Copeland had increased the net worth of Copeland's investment to $15 million. Rice also told Copeland that his investment would grow to $20 million, if Copeland permitted Rice to continue trading Copeland's funds until January 2009. In reliance on Rice's claims of past and continued profitability and minimization of risks, Copeland did not ask for return of his funds from Defendants.

40. At the same September 2008 meeting, Copeland confided in Rice for the first time that he had misappropriated the funds that he invested with Defendants from his real estate investors.

41. Two months later, in November 2008, Rice notified Copeland that all of his funds had been purportedly lost in trading.

42. In February 2009, Rice notified Copeland that Defendants' trading had never been insured against loss.

43. Copeland demanded that Defendants return his principal investment. Since December 2008, Defendants have only returned approximately $773,000 to Copeland, bringing the total amount of funds Defendants returned to Copeland since he initially invested with Defendants in March 2007 to approximately $2.7 million. Defendants returned approximately $873,000 of those funds post June 18, 2008.

44. In deciding to trade with Defendants, Copeland relied upon Defendants' material misrepresentations and omissions concerning the risks associated with trading forex. Copeland maintained his funds and deposited additional funds with Defendants based on Defendants' misrepresentations concerning Defendants' purportedly profitable trading and the value of

Copeland's investment with Defendants.

45. FinRob, acting through at least Rice, and Rice knowingly or recklessly made those material misrepresentations and omissions to induce Copeland to invest with them.

B. **DEFENDANTS' MISAPPROPRIATION OF FUNDS**

46. Defendants, through the acts and omissions of at least Rice, misappropriated Copeland's funds by transferring them to the Rice Companies and other Rice controlled third parties and using them to pay for business and personal expenses, without Copeland's knowledge or authorization.

47. Defendants, through the acts and omissions of at least Rice, funneled at least $2.4 million of Copeland's funds to various corporate entities that Rice controlled, including but not limited to the Rice Companies. Defendants transferred at least $576,000 of these funds after June 18, 2008.

48. The Rice Companies did not provide any apparent legitimate services nor have any interest or entitlement to Copeland's funds.

49. Defendants, through the acts and omissions of at least Rice, used at least $1.3 million of the Copeland funds held by the Rice Companies to pay for, among other things, luxury vacations, motorcycles and racehorses, to fund significant cash withdrawals, and to make payments on numerous credit cards held by various individuals and entities, including but not limited to Rice. Defendants expended at least $404,000 of these funds after June 18, 2008.

C. **DEFENDANTS' VIOLATIONS OF THE CEA**

50. By virtue of their actions, FinRob, acting through Rice, and Rice have engaged, are engaging, or are about to engage in acts and practices that violate Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C).

## V.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

### VIOLATIONS OF SECTIONS 4b(a)(2)(A) and (C): FRAUD BY MISREPRESENTATION AND OMISSION

51.  The allegations set forth in paragraphs 1 through 50 are realleged and incorporated herein by reference.

52.  Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C), makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; … [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

53.  As set forth above, from at least June 18, 2008, in or in connection with forex contracts, made or to be made, for or on behalf of, or with, other persons, FinRob, acting through at least Rice, and Rice cheated or defrauded or attempted to cheat or defraud at least one person, Copeland, and willfully deceived or attempted to deceive at least one person, Copeland, by, among other things, knowingly making material misrepresentations and omissions concerning, but not limited to, insurance against loss, guaranteed return of principal, profitable trading on behalf of Copeland, increase in value of Copeland's investment and the risks involved in trading forex, all in violation of Section 4b(a)(2)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

54. FinRob, acting through at least Rice, and Rice engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

55. The foregoing fraudulent acts, misrepresentations, omissions and failures of Rice occurred within the scope of his employment or office with FinRob. FinRob is therefore liable for these acts pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

56. Each act of fraudulent solicitation and misrepresentation and omission of material fact made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C).

## COUNT TWO

### VIOLATIONS OF SECTIONS 4b(a)(2)(A) and (C): FRAUD BY MISAPPROPRIATION

57. The allegations set forth in paragraphs 1 through 56 are realleged and incorporated herein by reference.

58. Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C), makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; … [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

59. As set forth above, from at least June 18, 2008, in or in connection with forex contracts, made or to be made, for or on behalf of, or with, other persons, FinRob, acting through at least Rice, and Rice cheated or defrauded or attempted to cheat or defraud at least one person, Copeland, and willfully deceived or attempted to deceive at least one person, Copeland, by, among other things, using funds solicited from Copeland to funnel to third parties under Rice's control and to pay for Defendants' business and personal expenses.

60. Defendants knowingly misappropriated funds in violation of Section 4b(a)(2)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

61. The foregoing misappropriation by Rice occurred within the scope of his employment or office with FinRob. FinRob is therefore liable for these acts pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

62. Each act of misappropriation made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the CEA, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C).

## VI. RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers enter:

a) an order finding that Defendants violated Section 4b(a)(2)(A) and (C) of the CEA, as amended, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C);

b) an order of permanent injunction prohibiting Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with them, from, directly or indirectly:

1. engaging in conduct in violation of Section 4b(a)(2)(A) and (C) of the CEA, as amended, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C);

2. trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the CEA, as amended, to be codified at 7 U.S.C. § 1a);

3. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the CEA, as amended, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

4. having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

5. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

6. soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

7. applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

8. acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

c) an order directing Defendants and any third party transferee and/or successor thereof, to disgorge, pursuant to such procedures as the Court may order, all benefits received from the acts or practices which constitute violations of the CEA, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

d)     an order directing Defendants to make full restitution to every customer or participant who was defrauded by Defendants as a result of acts and practices which constituted violations of the CEA, as described herein, and pre- and post-judgment interest thereon from the date of such violations or the entry of the order, as applicable;

e)     an order directing the Defendants to each pay a civil monetary penalty of not more than the higher of $130,000 for each violation of the CEA committed on or between June 18, 2008 and October 22, 2008, or $140,000 for each violation of the CEA committed on or after October 23, 2008, or triple the monetary gain to the Defendants, plus post-judgment interest;

f)     an order directing Defendants and any of their successors to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customers or participants whose funds were received by Defendants as a result of the acts and practices that constitute violations of the Act as described herein;

g)     an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

h)     an order providing such other and further remedial ancillary relief as the Court may deem appropriate.

Dated: April 1, 2013

ATTORNEYS FOR THE PLAINTIFF
U.S. COMMODITY FUTURES
TRADING COMMISSION

/s/ Kevin S. Webb
Kevin S. Webb, DC Bar #484866
Attorney-in-Charge
James H. Holl, III, CA Bar #177885
Gretchen L. Lowe, DC Bar # 421995
U.S. Commodity Futures Trading Commission
1155 21st Street NW
Washington, DC 20581
Telephone: (202) 418-5000
Facsimile: (202) 418-5538