IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:11-cv-02446 |
| FINANCIAL ROBOTICS, INC., a Texas corporation, and MARK E. RICE, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**ORDER OF DEFAULT JUDGMENT, PERMANENT INJUNCTION, RESTITUTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT FINANCIAL ROBOTICS, INC.**

## I.    BACKGROUND

On June 29, 2011, Plaintiff U.S Commodity Futures Trading Commission ("Commission") filed a Complaint for Permanent Injunction, Disgorgement, Restitution, Civil Monetary Penalties and Other Equitable Relief ("Complaint") (Dkt. #1) against Defendants Financial Robotics, Inc. ("FinRob") and Mark E. Rice ("Rice")(collectively, "Defendants") for violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6b(a)(2)(A) & (C) (2012).

On June 30, 2011, the Court entered an Order Granting Plaintiff's *Ex Parte* Motion for Statutory Restraining Order, Expedited Discovery, Accounting, Order to Show Cause re Preliminary Injunction and Other Equitable Relief ("SRO") (Dkt. #6).

On June 30, 2011, Plaintiff served the Complaint, SRO and a Summons on FinRob by serving its owner, managing and general agent and controlling person, Rice.  Dkt. #12.

On July 8, 2011, the Court appointed Receiver in this matter served the SRO on FinRob by serving Rice. Dkt. #17.  On that same date, Plaintiff served the Court's Procedures on FinRob by serving Rice.  Dkt. #19.

On July 20, 2011, Plaintiff served the Complaint, Summons, SRO and Court's Procedures on FinRob by serving its Vice President, Secretary and Treasurer, Bryan Wright. Dkt. #23.

On August 8, 2011, the Court entered an Order of Preliminary Injunction and Other Equitable Relief Against Defendants (Dkt. #34).

On June 27, 2013, the Commission filed an Amended Complaint Against Defendants (Dkt. #190).

On July 3, 2013, the Court granted the Commission's Motion to File an Amended Complaint Against Defendants.  Dkt #187.

On September 19, 2013, the Clerk of the Court issued summonses for the Amended Complaint to Defendants.

On November 1, 2013, Plaintiff served the Amended Complaint, Summons and Court's Procedures on  FinRob by serving its Director, Matthew Skaggs.  Dkt. #195.

On January 13, 2014, the Court entered a Consent Order of Permanent Injunction, Restitution, Civil Monetary Penalty, and Other Equitable Relief Against Rice (Dkt. #200).

FinRob failed to file an answer or other responsive pleading to the Complaint and Amended Complaint as provided by Fed. R. Civ. P. 55(a).

On September 10, 2014, the Commission filed a Motion for Default Judgment, Permanent Injunction, Restitution, Civil Monetary Penalty and Other Equitable Relief Against FinRob. ("Motion").

The Court has considered carefully the Amended Complaint, the allegations of which are well-pleaded and hereby taken as true, and the Motion, and being fully advised in the premises, hereby:

**GRANTS** the Commission's Motion and enters the following findings of fact and conclusions of law finding FinRob liable as to all violations as alleged in the Amended Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Ancillary Equitable Relief Against Defendant FinRob ("Order"), which finds that FinRob violated 7 U.S.C. §§ 6b(a)(2)(A) & (C), and imposes on FinRob a permanent injunction, remedial ancillary relief, including an order to pay restitution and civil monetary penalties.

## II.   FINDINGS OF FACT

### A.   The Parties

#### 1.   Plaintiff

Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA, 7 U.S.C. §§ 1 *et seq.* (2012), and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013). The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

#### 2.   Defendant in Default

Defendant **Financial Robotics, Inc.** is a Texas corporation with its principal places of business at 2700 Post Oak Boulevard, Suite 2375, Houston, Texas. FinRob is engaged in the business of providing advice for profit on the trading of forex and soliciting and accepting funds to trade forex on behalf of others. FinRob has never been registered with the Commission in any capacity. FinRob is not a minor, incompetent, or currently a member of any branch of the

military service of the United States or otherwise exempted under the Service Members Civil Relief Act and Fed. R. Civ. P. 55(b)(2).

### 3. Other Defendant

Defendant **Mark E. Rice** currently resides in Sugar Land, Texas.  He was engaged in the business of providing advice for profit on the trading of forex and soliciting and accepting funds to trade forex on behalf of others.  Rice is the apparent owner and manager of FinRob.  Rice has never been registered with the Commission in any capacity.

### B.    FinRob's Conduct

### 1. Defendants' Fraudulent Solicitation

Since at least September 2006,[1] FinRob, by and through Rice, fraudulently solicited at least $10.4 million from at least one investor, Copeland, to trade off-exchange foreign currency ("forex") that is margined or leveraged.

### a) FinRob's Initial Misrepresentations and Omissions

FinRob at all relevant times herein, solicited Copeland directly or through its agents, employees or officers, through face-to-face meetings, e-mail and telephone communications. FinRob used the instrumentalities of interstate commerce in its solicitations of Copeland.

Rice held himself out as the owner and manager of FinRob at all relevant times including, but not limited to, when he solicited funds from Copeland on behalf of FinRob.

In his solicitations of Copeland on behalf of FinRob, Rice told Copeland that FinRob developed automated forex software trading programs known as expert advisors ("EAs") that generated significant profits (10-15% per month) in actual trading.

---

[1] The Commission's Amended Complaint only asserted jurisdiction over those activities occurring on or after June 18, 2008, the date of the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")) §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008).

FinRob, through Rice, told Copeland that his investment would be "risk free." Additionally, Rice, on behalf of FinRob, guaranteed that if Copeland invested with FinRob, Copeland would not lose any of his principal investment because FinRob had an insurance policy that protected against any loss of principal.

FinRob did not disclose to Copeland that it would transfer Copeland's funds to Rice-controlled entities (the "Rice Companies") and use those funds to pay FinRob's business expenses and Rice's personal expenses.

FinRob did not disclose to Copeland that in 2002, this Court found that Rice orchestrated schemes to manipulate the stock of four publicly held entities through Rice-controlled companies, in violation of the anti-fraud provisions of the Exchange Act, 15 U.S.C. § 78j(b) (2010). *Final Judgment by Default Against Mark E. Rice, SEC v. Rice*, No. H-02-0636 (S.D. Tex. Aug. 16, 2002).

In reliance on Rice's statements regarding FinRob's profitable trading history, Rice's claims that Copeland's investment would be "risk free" and insured against loss, and Rice's guaranteed return of Copeland's principal, and with no knowledge of Rice's past fraud or Defendants' misappropriation of his funds, Copeland entrusted FinRob with approximately $10.4 million of his investors' funds to trade forex.

Despite Rice's claims of past profitable trading using EAs, on behalf of FinRob, neither Rice nor FinRob ever traded forex prior to managing forex trading accounts on behalf of Copeland.

### b) FinRob Controlled Copeland's Funds and the Trading of Those Funds

FinRob, through Rice, initially instructed Copeland to open a trading account with a futures commission merchant, Interbank FX, Inc. ("IBFX"), and deposit funds for investment

into that account.

In January 2007, Copeland deposited approximately $502,000 into the IBFX account. FinRob, through Rice, controlled all of the forex trading in Copeland's IBFX accounts and provided performance reports to Copeland via e-mail. Between January 2007 and May 2007, Rice's trading of the funds in the accounts resulted in losses of approximately $101,000.

After only a few months of trading, FinRob, through Rice, lured Copeland into giving FinRob control of Copeland's funds by telling Copeland that significant losses could be avoided if Copeland withdrew his funds from IBFX and deposited them directly with FinRob. Rice, on behalf of FinRob, informed Copeland that FinRob was going to move all of its investments to England, as that market could provide greater returns than the American market. In reliance on Rice's promises of improved performance, Copeland withdrew his funds from IBFX and transferred them directly to bank accounts controlled by Defendants to trade forex.

FinRob, through Rice, directed Copeland to deposit his funds for investment into bank accounts held by FinRob and another Rice-controlled entity, Commodity Futures and Options Services, Inc. ("CFOS"). Between March 2007 and August 2008, Copeland wired approximately $9.9 million to CFOS and FinRob bank accounts for investment in forex managed by FinRob, through Rice. Most of the Copeland funds went into FinRob bank accounts.

As of June 18, 2008, FinRob maintained at least $303,000 of Copeland's funds in bank and trading accounts that they controlled. Copeland wired approximately $1.4 million to FinRob after June 18, 2008, bringing Copeland's post-June 18, 2008 total deposits with FinRob to at least $1.7 million.

Between May 2007 and September 2008, FinRob, through Rice, deposited approximately $5.75 million of Copeland's funds into leveraged forex trading accounts held in the name of

CFOS, FinRob and Wertpatiere Kreditanstalt AG Trust at various FCMs and brokerage houses. FinRob, through Rice, deposited approximately $408,000 of the Copeland funds into FinRob forex trading accounts after June 18, 2008.

In those trading accounts, between October 2007 and January 2009, FinRob, through Rice, traded some of the Copeland funds and sustained net losses of approximately $2.9 million. FinRob sustained trading losses of approximately $382,509 in its trading accounts after June 18, 2008.

### c) FinRob's Continued Misrepresentations and Omissions

Copeland maintained his funds with FinRob based on the positive returns Rice reported to Copeland, Rice's continued assurances that Copeland's investment was "risk free" and FinRob wiring purported trading earnings to Copeland. On a weekly basis, Rice, on behalf of FinRob, engaged in telephone conversations with Copeland regarding the performance of Copeland's investment. Despite sustaining significant, recurring losses trading Copeland's funds, FinRob, through Rice, routinely informed Copeland that FinRob's trading of his funds consistently generated returns between 5-9% per month and experienced no losses. From July 2007 to September 2008, FinRob, through Rice, wired approximately $1.7 million to Copeland as purported earnings from its trading of his funds in forex, despite sustaining significant trading losses during that time period. FinRob, through Rice, wired approximately $100,000 of those purported earnings to Copeland after June 18, 2008.

As of September 2008, FinRob's trading of Copeland's funds, through Rice, had sustained at least $2.8 million in net cumulative trading losses. Regardless, in September 2008, FinRob misrepresented to Copeland that his investment with FinRob realized earnings of approximately $5 million and would further increase in value. At a September 2008 meeting in

7

Houston, Texas, FinRob, through Rice, talked Copeland out of liquidating his account based on Rice's claims of historic and future profitability. Rice, on behalf of FinRob, showed Copeland an account statement reporting that FinRob's forex trading on behalf of Copeland was consistently profitable and had made overall net profits of approximately $5 million. FinRob, through Rice, also told Copeland that his investment would make an additional $5 million in overall net profits, if Copeland permitted FinRob to continue trading Copeland's funds until January 2009. In reliance on Rice's claims of past and continued profitability and minimization of risks, Copeland maintained his investors' funds with FinRob.

At the same September 2008 meeting, Copeland confided in Rice for the first time that he had misappropriated the funds that he invested with FinRob from his real estate investors. Shortly thereafter, FinRob, through Rice, informed Copeland that all of his funds had been lost in trading and that FinRob's investments had never been insured against loss.

Copeland demanded that FinRob return his principal investment. Since December 2008, FinRob has only returned approximately $773,000 to Copeland, bringing the total amount of funds FinRob returned to Copeland since he initially invested with FinRob in March 2007, to approximately $2.7 million. FinRob returned approximately $873,000 of those funds post June 18, 2008.

### 2.  FinRob's Misappropriation of Copeland's Funds

FinRob, through Rice, misappropriated Copeland's funds by transferring them to the Rice Companies and other Rice controlled third parties and using them to pay for business and personal expenses, without Copeland's knowledge or authorization.

FinRob, through Rice, funneled at least $2.4 million of Copeland's funds to Rice-controlled companies, and used at least $1.3 million of Copeland's funds to pay for, among other

things, luxury vacations, motorcycles and racehorses, to fund significant cash withdrawals, and to make payments on numerous credit cards held by various individuals and entities, including but not limited to Rice.  Post-June 18, 2008, FinRob, through Rice, misappropriated at least $576,000 of Copeland's funds by transferring them to Rice-controlled companies and using at least $404,000 of those funds to pay for FinRob' business expenses and Rice's personal expenses.  FinRob never disclosed to Copeland that it transferred his funds to Rice-controlled companies and that it used his funds to pay FinRob's business expenses and Rice's personal expenses.

### III.   CONCLUSIONS OF LAW

When a party against whom a default judgment is sought has failed to plead or otherwise assert a defense, and that fact has been documented, the clerk shall enter the party's default and the party seeking the default shall apply to the court for a default judgment.  Fed. R. Civ. P. 55(a) and (b).  Entry of default judgment is left to the sound discretion of the trial court.  *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (court will review the denial of relief for default judgment only for abuse of discretion).  While the Fifth Circuit has a strong policy that cases should ordinarily be decided on the merits, *see United States v. One Parcel of Real Property*, 763 F.2d 181, 183 (5th Cir. 1985), default judgment is appropriate when the adversary process has been halted because of an unresponsive party.  *See Sun Bank of Ocala v. Pelican Homestead and Sav. Assoc.*, 874 F.2d 274, 276 (5th Cir. 1989).

Upon default, the well-pled allegations in the complaint are to be taken as true for purposes of establishing liability.  Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the

allegation is not denied."); *United States v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987); *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

In this matter, FinRob has failed to plead as required under Fed. R. Civ. P. 55(a).  As such, FinRob is in default and in accordance with Fed. R. Civ. P. 55(b)(2), the allegations in the Complaint will be taken as true and a default judgment is hereby entered against FinRob.

## A.  Jurisdiction and Venue

This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the CEA, or any rule, regulation or order thereunder.

The Commission has jurisdiction over the forex solicitations and transactions at issue in this action pursuant 7 U.S.C. §§ 2(c)(2)(C) & 13a-1 (2012).

Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2012), because Defendants are found, inhabit, reside and/or transact business in the Southern District of Texas, and certain of the transactions, acts, practices, and courses of business alleged to have violated the CEA occurred, are occurring, and/or are about to occur within this District.

## B.  Violation of 7 U.S.C. §§ 6b(a)(2)(A) & (C)

Pursuant to 7 U.S.C. §§ 6b(a)(2)(A) & (C), it is unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or

10

attempt to cheat or defraud the other person; . . . or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person. Through its and its agent's fraudulent misrepresentations and omissions of material facts and misappropriation, FinRob violated 7 U.S.C. §§ 6b(a)(2)(A) & (C).

### 1. Fraud By Misrepresentation and Omission

To establish a violation of 7 U.S.C. §§ 6b(a)(2)(A) & (C), the Commission must prove that: (1) a misrepresentation or misleading statement was made, or deceptive omission occurred; (2) with scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was material. *CFTC v. King*, No. 3:06-CF-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (*citing CFTC v. R.J. Fitzgerald & Co.*, 310 F. 3d 1321, 1328 (11th Cir. 2002)). As discussed below, FinRob, through Rice, made intentional and reckless misrepresentations and omissions of material fact regarding profits, guarantees and risk in its solicitations of Copeland, thereby violating 7 U.S.C. §§ 6b(a)(2)(A) & (C).

### a. FinRob's Misrepresentations and Omissions

When determining whether a misrepresentation has been made, one must look to the "overall message" and the "common understanding of the information conveyed." *R.J. Fitzgerald*, 310 F.2d at 1328. The allegedly false or misleading representations should be viewed through the eyes of an objectively reasonable person interpreting their overall message. *Id.* at 1329. Further, misrepresentations concerning the likelihood of profiting from forex trading and risk of loss are generally deemed to be material and violative of the antifraud provisions of the CEA. *First Nat. Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir. 1987); *CFTC*

*v. Avco Financial Corp.*, 28 F. Supp. 2d 104, 115-16 (S.D.N.Y. 1998), *aff'd in part, rev'd in part, remanded in part on other grounds sub nom. CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000). "Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in part, vacated in part sub nom. CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002); *see also CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1160 (S.D.N.Y. 1979) (misrepresentations regarding profitability of investment are material).

Here, FinRob, through Rice, made multiple misrepresentations in its solicitations of Copeland to participate in forex trading.  In its solicitations, FinRob, through Rice, claimed that FinRob's past forex trading had been successful, guaranteed that Copeland's investment would be "risk free" and misrepresented that FinRob maintained an insurance policy that would protect Copeland's principal investment from loss.  To maintain Copeland's funds and solicit additional funds, FinRob, through Rice, reported to Copeland that its trading of his funds resulted in significant profits.  However, FinRob never traded forex before trading Copeland's funds, its trading of Copeland's funds sustained consistent monthly losses and FinRob never held an insurance policy protecting Copeland's principal from loss.

Additionally, FinRob made omissions of fact in its solicitations of Copeland.  FinRob did not disclose to Copeland that: 1) that FinRob would transfer Copeland's funds to the Rice Companies and use those funds to pay FinRob's business expenses and Rice's personal expenses; and 2) in 2002, this Court found that Rice orchestrated schemes to manipulate the stock of four publicly held entities through Rice-controlled companies, in violation of the anti-fraud provisions of the Exchange Act, 15 U.S.C. § 78j(b).  FinRob had a duty to disclose these

12

facts given that it, knowingly, willingly, or with reckless disregard for the truth, made material misrepresentations concerning potential returns that they could generate through its trading.  A defendant has a duty to disclose facts when its failure to disclose those facts would render the defendant's own prior speech misleading or deceptive.  *R.J. Fitzgerald*, 310 F.3d at 1332-33 (given the "extremely rosy picture" they painted for a huge profit potential in their commercials and seminars, defendants had a duty to disclose that 95% or more of its investors lost money). FinRob's misrepresentations, including FinRob's claims of profitable trading history, "risk free" trading and insurance protecting Copeland's principal, gave rise to a duty to disclose the truth about FinRob's trading losses and misappropriation.  By omitting these facts, FinRob violated 7 U.S.C. §§ 6b(a)(2)(A) & (C).

### b.  FinRob's Misrepresentations and Omissions Are Material

A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Technical Servs. Ltd. v. CFTC*, 205 F.3d 165, 169 (5th Cir. 2000).  "The test is an objective, not subjective, inquiry."  *SEC v. Hoover*, 903 F. Supp. 1135, 1140 (S.D. Tex. 1995). Misrepresentations regarding profit and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law."  *Noble Wealth*, 90 F. Supp. 2d at 686 (citing *CFTC v. Commonwealth Fin. Group*, 874 F. Supp. 1345, 1353–54 (S.D. Fla. 1994) ("combined with claims that risks are subject to specific limitations, profit claims amount to guarantees of profitability prohibited by [7 U.S.C. §§ 6b]"); *Hall v. Paine Webber Jackson & Curtis, Inc.*, [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,317 at 32,890 (CFTC Oct. 8, 1986) (when broker emphasized limited risk and explained rationale for expected profits, it was reasonable for customer to interpret a prediction of a specific and substantial level of profits as a

13

guarantee of some profit)).  "'When the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers.'"  *Noble Wealth,* 90 F. Supp. 2d at 686 (citation omitted).

FinRob's initial and continuing misstatements and omissions regarding past, present and future trading activity and profits, guaranteed return of principal, "risk free" trading, insurance policy against trading losses, prior fraud judgments and misappropriation of funds, were material because a reasonable investor would have relied on these statements in determining whether to invest in forex and, more specifically, whether to invest, reinvest and maintain funds with FinRob. *See R.J. Fitzgerald,* 310 F.3d at 1328-29; *R&W Technical Servs.,* 205 F.3d at 169.

### c.  FinRob Acted with Scienter

The scienter element of 7 U.S.C. §§ 6b(a)(2)(A) & (C) fraud is established when an individual's "conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant 'must have been aware' of the risk." *King,* 2007 WL 1321762, at *2 (citing *R.J. Fitzgerald,* 310 F.3d at 1328); *see also Wasnick v. Refco, Inc.,* 911 F.2d 345, 348 (9th Cir. 1990) (holding that scienter is established, when an individual's acts are performed "with knowledge of their nature and character").  In order to meet the scienter requirement, the Commission must demonstrate that FinRob made the misrepresentations and omissions intentionally or recklessly.  *See Drexel Burnham Lambert Inc. v. CFTC,* 850 F.2d 742, 748 (D.C. Cir. 1988) ("recklessness is sufficient to satisfy [the predecessor to 7 U.S.C. §§ 6b(a)(2)(A) & (C)]'s scienter requirement").  To prove that the conduct is intentional, the Commission must demonstrate that the actions of FinRob were "intentional as opposed to accidental." *Lawrence v. CFTC,* 759 F.2d 767, 773 (9th Cir.

14

1985). To prove that conduct is reckless, the Commission must show that it "'departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing.'" *Drexel*, 850 F.2d at 748 (alteration in original) (citation omitted).

The Commission need not prove that FinRob possessed an evil motive or intent to injure a customer, or that it subjectively wanted to cheat or defraud Copeland. *See Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987); *Lawrence*, 759 F.2d at 773 ("Proof of an evil motive is unnecessary."). "It is enough that [they] acted deliberately." *Haltmier v. CFTC*, 554 F.2d 556, 562 (2d Cir. 1977). Moreover, "the element of knowledge cannot be precluded by ignorance brought about by willfully or carelessly ignoring the truth." *CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir. 1979).

FinRob, through Rice, acted with the requisite intent to defraud. FinRob, through Rice, controlled Copeland's funds, the trading of those funds and the information provided to Copeland regarding FinRob's trading history, the risks associated with trading with FinRob and FinRob's management and trading of Copeland's funds. Accordingly, Rice, on behalf of FinRob, knew, or recklessly disregarded, that its statements were false. FinRob knew that neither Rice nor FinRob had conducted any actual forex trading or realized any profits from actual trading before soliciting Copeland. Furthermore, because FinRob controlled the handling and trading of Copeland's funds, FinRob knew that its trading of Copeland's funds had resulted in significant losses, and that the investments were not "risk free." FinRob knew, or recklessly disregarded the truth that it could not guarantee the return of Copeland's principal, and that there was no insurance policy protecting FinRob's investments against loss. FinRob also knowingly failed to disclose that Rice had committed fraud in violation of the anti-fraud provisions of the Exchange Act and that it was misappropriating Copeland's funds. FinRob's actions were

intentional or reckless, and involved "'highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care,'" *Noble Wealth,* 90 F. Supp. 2d at 686–87 (citation omitted), and as such, they were made with scienter.

### 2. Fraud by Misappropriation

Misappropriation of customer funds constitutes "willful and blatant" fraud in violation of 7 U.S.C. §§ 6b(a)(2)(A) & (C). *Id.* Post-June 18, 2008, FinRob, through Rice, misappropriated at least $576,000 of Copeland's funds by transferring them to Rice-controlled companies and using at least $404,000 of those funds to pay for, among other things, luxury vacations, motorcycles and racehorses, to fund significant cash withdrawals, and to make payments on numerous credit cards held by various individuals and entities, including but not limited to Rice. FinRob never disclosed to Copeland that it transferred his funds to Rice-controlled companies and that it used his funds to pay FinRob's business expenses and Rice's personal expenses.

FinRob's use of Copeland's funds to pay for business and personal expenses are clear violations of 7 U.S.C. §§ 6b(a)(2)(A) & (C). *See King,* 2007 WL 1321762, at *2 ("King's violation of [the predecessor to 7 U.S.C. § 6b] is further proven by his admitted misappropriation of customer funds for personal and professional use"); *Noble Wealth,* 90 F. Supp. 2d at 683 (defendants violated the predecessor to 7 U.S.C. § 6b by diverting investor funds for operating expenses and personal use); *CFTC v. Skorupskas,* 605 F. Supp. 923, 932 (E.D. Mich. 1985) (defendant violated the predecessor to 7 U.S.C. § 6b when she misappropriated pool participant funds by soliciting funds for trading and then trading only a small percentage of those funds, while disbursing the rest of the funds to investors, herself, and her family); *In re Slusser,* [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,701 at 48,315 (CFTC July 19, 1999)

(respondents violated the predecessor to 7 U.S.C. § 6b by surreptitiously retaining money in their

own bank accounts that should have been traded on behalf of participants), *aff'd in relevant part

sub nom. Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000) ; *CFTC v. McLaurin*, [1994-1996

Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,768 at 44,180 (N.D. Ill. July 1, 1996) (by

depositing customer funds in accounts in which the customers had no ownership interest and

making unauthorized disbursements for his own use, defendant violated the predecessor to 7

U.S.C. § 6b).

**C.      FinRob Is Liable Under 7 U.S.C. § 2(a)(2)(B) for Rice's Violations of 7 U.S.C. §§ 6b(a)(2)(A) & (C)**

As demonstrated, Rice committed the acts and omissions described herein within

the course and scope of his office, agency or employment with FinRob.  FinRob, therefore, is

liable pursuant to 7 U.S.C. § 2(a)(2)(B) (2012), as a principal for its agent's, i.e., Rice's,

violations of 7 U.S.C. §§ 6b(a)(2)(A) & (C).

Each act of misappropriation, misrepresentation or omission of material facts, including,

but not limited, to those specifically alleged herein, is alleged as a separate and distinct violation

of 7 U.S.C. §§ 6b(a)(2)(A) & (C).

**D.      Reasonable Likelihood of Continued Misconduct by FinRob**

In order to obtain permanent injunctive relief in an action under 7 U.S.C. § 13a-1 (2012),

the Commission must not only establish that a violation of the CEA has occurred, but also that

there is a reasonable likelihood of future violations.  *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th

Cir. 1978); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 454 (D.N.J. 2000) ("The District Courts

also have jurisdiction to enter a permanent injunction 'upon a proper showing.'"); *Kelley v. Carr*,

567 F. Supp. 831, 839-40 (W. D. Mich. 1983).  Accordingly, once the Commission demonstrates

that the defendant violated the CEA, then the Commission only needs to show that there is some

reasonable likelihood of future violations to obtain permanent injunctive relief. *CFTC v. Wilshire Inv. Mgmt. Corp.* 531 F.3d 1339, 1346 (11th Cir. 2008) ("The CEA allows a district court, 'upon a proper showing,' to grant a permanent injunction… 'the ultimate test… is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" (citation omitted)).  To be sure, while past misconduct does not require the conclusion that there is a likelihood of future misconduct, it is "highly suggestive of the likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1219-20 (7th Cir. 1979), *cert denied*, 442 U.S. 921 (1979); *CFTC v. American Metals Exch. Corp.*, 693 F. Supp. 168, 191 (D.N.J. 1988) ("[t]he likelihood of future violations may be inferred from past infractions based upon consideration of the totality of the circumstances to determine if the past infraction was an isolated occurrence as opposed to an indication of a systematic and continuous pattern of wrongdoing"); *cf. SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981) ("[T]he Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of the present circumstances, betoken a 'reasonable likelihood' of future transgressions") (citations omitted)), *cert denied*, 454 U.S. 1124 (1981).

In contrast with other civil litigation, in an action for permanent injunctive relief, the Commission is *not* required to make a specific showing of irreparable injury or inadequacy of other remedies which private litigants must make. *Muller,* 570 F.2d at 1300.  Additionally, because enforcement proceedings under 7 U.S.C. § 13a-1 involve the public interest rather than a private controversy, the equitable jurisdiction of the district court is not to be denied or limited in the absence of a clear legislative command. *Hunt,* 591 F.2d at 1222 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)); *Kelley,* 442 F. Supp. at 360 (granting default judgment

for permanent injunction).  In such a proceeding, the court's equitable powers are broader and more flexible than in private controversies.  *Hunt*, 591 F.2d at 1223.

Here, the Commission has made a showing that FinRob engaged in acts and practices that violated 7 U.S.C. §§ 6b(a)(2)(A) & (C).  Based on the egregiousness of the conduct in this matter, it is clear that, unless restrained and enjoined by this Court, there is a reasonable likelihood that the FinRob will continue to engage in the acts and practices alleged in the Amended Complaint and in similar acts and practices in violation of the CEA and Regulations.

## IV.    REMEDIES

### A. Permanent Injunction

Pursuant to 7 U.S.C. § 13a-1, the Commission has demonstrated that FinRob engaged in acts and practices which violated 7 U.S.C. §§ 6b(a)(2)(A) & (C).  Unless restrained and enjoined by this Court, there is a reasonable likelihood that FinRob will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the CEA. Based on the conduct described above, the Court enters an injunction against FinRob permanently restraining, enjoining, and prohibiting it from directly or indirectly:

1.  Engaging in conduct that violates 7 U.S.C. §§ 6b(a)(2)(A) & (C);

2.  Engaging in any activity involving:

    a.  trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a (2012));

    b.  entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in 17 C.F.R. § 1.3(hh) (2013)), security futures products, swaps (as that term is defined in 7 U.S.C. § 1a(47) (2012), and as further defined by 17 C.F.R. § 1.3(xxx)

(2013)), and/or foreign currency (as described in 7 U.S.C. § 2(c)(2)(B) &
(C)(i) (2012)) ("forex contracts") for their own personal account(s) or for any
account(s) in which they have a direct or indirect interest;

c.   having any commodity futures, options on commodity futures, commodity
options, security futures products, swaps, and/or forex contracts traded on their
behalf;

d.   controlling or directing the trading for or on behalf of any other person or
entity, whether by power of attorney or otherwise, in any account involving
commodity futures, options on commodity futures, commodity options,
security futures products, swaps, and/or forex contracts;

e.   soliciting, receiving, or accepting any funds from any person for the purpose
of purchasing or selling any commodity futures, options on commodity
futures, commodity options, security futures products, swaps, and/or forex
contracts;

f.   applying for registration or claiming exemption from registration with the
Commission in any capacity, and engaging in any activity requiring such
registration or exemption from registration with the Commission, except as
provided for in 17 C.F.R. § 4.14(a)(9) (2013); and/or

g.   acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2013)),
agent or any other officer or employee of any person (as that term is defined
in 7 U.S.C. § 1a) registered, exempted from registration or required to be
registered with the Commission except as provided for in 17 C.F.R.
§ 4.14(a)(9).

**B.     Restitution**

**1.   The Court Has Authority to Order Restitution**

As discussed above, 7 U.S.C. § 13a-1, authorizes the Commission to bring an action to

enjoin violations of, and enforce compliance with the CEA.  In a civil enforcement action

brought pursuant to 7 U.S.C. § 13a-1, the district court may also order ancillary equitable relief

that it deems appropriate, including restitution and disgorgement. *CFTC v. Kimberlynn Creek*

*Ranch, Inc.,* 276 F.3d 187, 193 (4th Cir. 2002) ("[i]t is well settled that equitable remedies such

as disgorgement are available to remedy violations of the [Act]"); *United States v. Universal*

*Mgmt. Servs., Inc.*, 191 F.3d 750, 760-61 (6th Cir. 1999) ("[r]estitution and disgorgement are

part of the court's traditional equitable authority").  The Court's determination of restitution is

governed by its equitable powers to make whole the victims of a defendant's fraud. *Porter,* 328

U.S. at 398.  The pervasive and systematic nature of a defendant's fraud makes all customer

funds received subject to restitution. *CFTC v. Sidoti,* 178 F.3d 1132, 1138 (11th Cir. 1999)

(affirming that the systematic and pervasive nature of fraud renders all funds received by

defendants unlawful); *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93 (2d

Cir. 1986) (affirming imposition of disgorgement where appellant's fraud was not isolated but so

pervasive that all profits were illegally derived).

**2.   Restitution Will be Measured in Amount of Customer's Loss**

The object of restitution is to restore the status quo and return the parties to the positions

they occupied before the transactions at issue occurred. *Porter*, 328 U.S. at 402 (equitable

restitution consists of "restoring the status quo and ordering the return of that which rightfully

belongs to the purchaser or tenant"); *United States v. Long,* 537 F.2d 1151, 1153 (4th Cir. 1975)

(restitution consists of restoring the injured party "to the position he formerly occupied either by

21

the return of something which he formerly had or by the receipt of its equivalent in money") (quoting Restatement of Restitution, § 1, Comment: a, at 12 (1937)); *SEC v. AMX Int'l, Inc.,* 7 F.3d 71, 74–75 (5th Cir. 1993) ( "[r]estitution . . . has the goal of making the aggrieved party whole"); *First Penn Corp. v. FDIC,* 793 F.2d 270, 272 (10th Cir. 1986) ("[t]he object of restitution is to return the parties to the position that existed before the transaction occurred").

"Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." *Noble Wealth,* 90 F. Supp. 2d at 693; *see also CFTC v. Marquis Fin. Mgmt. Systems, Inc.,* No. 03-74206, 2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer deposits); *Rosenberg,* 85 F. Supp. 2d at 455 (ordering restitution in amount of customer deposits).

Post-June 18, 2008, FinRob solicited approximately $1.7 million from Copeland and returned $873,000 back to Copeland. Accordingly, the proper measure of restitution in this matter is the difference between $1.7 million and $873,000 – i.e., $827,000.

### 3.  Payment of Restitution

The Court orders FinRob to pay restitution in the amount of $827,000, plus post-judgment interest ("Restitution Obligation"), immediately. Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

To effect payment of the Restitution Obligation and the distribution of any restitution payments to FinRob's customer's customers (i.e., Copeland's customers), the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from FinRob and make distributions as set forth below. Because the

22

Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

FinRob shall make Restitution Obligation payments under this Order to the Monitor in the name "Financial Robotics Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under a cover letter that identifies its name and the name and docket number of this proceeding. FinRob shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Copeland's customers as identified by the U.S. District Court for the Northern District of Georgia, in its September 21, 2009 Amended Judgment in a Criminal Case, *United States v. Copeland*, No. 1:09-CR-00178-TCB (N.D. Ga. Sept. 21, 2009); or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to Copeland's customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Part C. below.

23

FinRob shall execute any documents necessary to release funds that it has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Copeland's customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The amounts payable to each of Copeland's customers shall not limit the ability of any of Copeland's customers from proving that a greater amount is owed from FinRob or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any of Copeland's customers that exist under state or common law.

Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each of Copeland's customers who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by FinRob to ensure continued compliance with any provision of this Order and to hold FinRob in contempt for any violations of any provision of this Order.

To the extent that any funds accrue to the U.S. Treasury for satisfaction of FinRob's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

To the extent this Court orders any other defendant in this action to pay restitution, FinRob's Restitution Obligation will be deemed satisfied, on a dollar-for-dollar basis by such

other defendant's payments in satisfaction of their restitution obligation pursuant to such other order of this Court.

## C.    Civil Monetary Penalty

### 1.    Calculation of Penalty

The Court has jurisdiction to impose a Civil Monetary Penalty ("CMP") of "not more than the greater of [$130,000 for each violation occurring prior to October 23, 2008 and $140,000 for each violation occurring on or after October 23, 2008],[2] or triple the monetary gain to the [Defendant] for each violation." 7 U.S.C. §13a-1(d) (2012); *see* also *CFTC v. Hayes*, No. 4:06CV130, 2007 WL 858772 at *5 (E.D. Va. Mar. 13, 2007) (imposing penalty of triple the monetary gain). The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent. *See Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999). "In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations." *Noble Wealth*, 90 F. Supp. 2d at 694. Conduct that violates the core provisions of the CEA, such as customer fraud, should be considered extremely serious. *See JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995). In *JCC, Inc.*, the U.S. Court of Appeals for the Eleventh Circuit upheld the district court order imposing a civil monetary penalty, finding that "[c]onduct that violates the core provisions of the Act's regulatory system – such as manipulating prices or *defrauding customers should be considered very serious* even if there are mitigating facts and circumstances." *Id.* at 1571. In the case at hand, there are no mitigating facts or circumstances. Instead, FinRob was blatant and malicious in its fraudulent conduct.

---

[2] *See* 17 C.F.R. § 143.8(a)(1)(iii)-(iv) (2013).

The Commission requests that the Court impose a serious and significant sanction and order FinRob to pay a CMP of triple the monetary gain, i.e., triple the amount of money that it failed to return to Copeland ($827,000).  The Court agrees that a serious and significant sanction should be imposed and the Court will order FinRob to pay a penalty of $2,481,000 ("CMP Obligation"), which represents three times the monetary gain.

### 2.  Payment of Penalty

FinRob shall pay the CMP Obligation immediately and post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961 (2000).

FinRob shall pay its CMP Obligation by electronic funds transfer, or by U.S. Postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
Attn:  Accounts Receivables – AMZ 340
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, Oklahoma 73169
Telephone: 405-954-5644

If payment is to be made by electronic funds transfer, FinRob shall contact Nikki Gibson or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  FinRob shall accompany payment of the penalty with a cover letter that identifies its name and the name and docket number of the proceedings.  FinRob shall simultaneously transmit copies of the cover letter and the form of payment to the Director,

Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre,

1155 21st Street, NW, Washington, DC 20581, and the Chief, Office of Cooperative

Enforcement, Division of Enforcement, at the same address.

**D.     Miscellaneous Provisions**

**Equitable Relief:**  The injunctive and equitable relief provisions of this Order shall be

binding upon FinRob and upon any persons who are acting in the capacity of agent, officer,

employee, servant, attorney, successor and/or assign of FinRob, and upon any person acting in

active concert or participation with FinRob who receives actual notice of this Order by personal

service or otherwise.

**Notices:**  All notices required to be given to the Commission by any provision in this

Order shall be sent certified mail, return receipt requested, as follows:

> Director of Enforcement
> Commodity Futures Trading Commission
> Division of Enforcement
> Three Lafayette Centre
> 1155 21st Street, NW
> Washington, DC 20581

**Continuing Jurisdiction of this Court:**  This Court shall retain jurisdiction of this case

to assure compliance with this Order and for all other purposes related to this action.

**IT IS SO ORDERED** on this 9ᵗʰ day of ___October___, 2014.

_____

**LEE H. ROSENTHAL**
**UNITED STATES DISTRICT JUDGE**